

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| RAM TOOL & SUPPLY CO., INC., | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | 2:11-CV-00210-LSC |
| | ] | |
| HD SUPPLY CONSTRUCTION SUPPLY | ] | |
| LTD, d/b/a White Cap Construction | ] | |
| Supply, et al., | ] | |
| | ] | |
| Defendants. | ] | |

MEMORANDUM OF OPINION

I.    Introduction.

The Court has for consideration Defendants' Consolidated Motion to

Dismiss for Lack of Personal Jurisdiction or, in the Alternative, to Transfer

Venue, which was filed on January 25, 2011.  (Doc. 3.)[1]  Plaintiff Ram Tool

& Supply Co., Inc. ("Ram Tool"), sued defendants HD Supply Construction

Supply, Ltd., d/b/a White Cap Construction Supply ("White Cap"); Robert

---

[1]Plaintiffs filed an Amended Complaint on February 11, 2011.  (Doc. 25.)
Defendants did not refile their motion to dismiss or transfer venue.  However, the Court
construes Defendants' earlier-filed motion as a motion to dismiss the Amended
Complaint.  The defendants at issue have continued to maintain their objections to
jurisdiction and venue.

Maples; David Mears[2]; Tim Pruitt; and Leonard Maruk for violation of the Alabama Trade Secrets Act ("ATSA"), Ala. Code § 8-27-1, *et seq.*; breach of fiduciary duty; conversion; tortious interference with business relationships; and civil conspiracy. (Doc. 25.) Plaintiff also petitioned the Court for a preliminary injunction preventing Defendants (and all employees of White Cap) from soliciting any Ram Tool employees; conducting business in the Nashville, Tennessee, market; and using confidential information obtained from Ram Tool to compete with Ram Tool in any market. (Doc. 30.)

The issues raised in Defendants' motion to dismiss or transfer venue and Plaintiff's motion for preliminary injunction have been fully briefed by the parties and are ripe for review. The Court also held an evidentiary hearing on March 9, 2011, and accepted supplemental filings following the hearing. After full consideration of the argument and evidence presented by the parties, it is the opinion of this Court that Defendants' motion to dismiss is due to be granted. Plaintiff's motion for preliminary injunction is due to be denied.

---

[2]By agreement of the parties, David Mears was dismissed as a defendant in this action on February 22, 2011. (Docs. 28, 29.)

II.    Facts.[3]

Plaintiff, Ram Tool & Supply Co., Inc., is an Alabama corporation with its principal place of business and headquarters in Birmingham, Alabama. Ram Tool operates a construction supply distribution business, which distributes tools and supplies to commercial contractors in fifteen (15) states. HD Supply Construction Supply, Ltd., d/b/a White Cap Construction Supply, is one of Ram Tool's competitors in the construction supply distribution industry. White Cap distributes tools and supplies in Alabama and many other locations where Ram Tool operates. Both companies share many of the same customers, purchase goods from many of the same vendors, and sell many of the same products.

In December 2010, five employees from Ram Tool's Nashville, Tennessee, branch resigned their employment to work for White Cap in Nashville. Prior to this time, White Cap did not operate a Nashville branch. The five employees included defendants Tim Pruitt ("Pruitt") and Leonard

---

[3]The facts set out in this Memorandum of Opinion are gleaned, where appropriate, from the Amended Complaint, the parties' submissions, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" only for the purposes of deciding Defendants' motion to dismiss or transfer venue and Plaintiff's motion for preliminary injunction.

Maruk ("Maruk"), as well as David Mears ("Mears"), Bill Peach ("Peach"), and John Morrissey ("Morrissey").  Pruitt worked for Ram Tool for five years in outside sales.  Before Ram Tool, Pruitt worked for White Cap.  Maruk began his employment with Ram Tool in 1997; at the time of his resignation, he worked in inside sales.  Mears also worked in inside sales.  Peach and Morrissey worked for Ram Tool in outside sales.  In January 2011, Tim McMaster, another Nashville Ram Tool employee, resigned to join White Cap. McMaster was employed with Ram Tool in outside sales.

During their employment at Ram Tool, Pruitt and Maruk had access to confidential and proprietary information and trade secrets, including customer, sales, and inventory data.  Both signed an acknowledgment that they received the Ram Tool Employee Handbook, which included a confidentiality policy.  (Pl. Ex. 2.) Moreover, every time an employee logged into a Ram Tool computer, the following statement appeared:

> All information on this computer and network is property of Ram Tool and Supply Co, Inc and is protected by state and federal law.  All users must be assigned an account to access information and are only allowed to access information as permitted by the System Administrator and your supervisor.  All user activities may be monitored and logged.

> Information residing on Ram Tool computers is not to
> be disclosed to outside parties without prior written
> consent of Ram Tool's Executive Management.  By
> proceeding you acknowledge your agreement with
> these terms.

(Pl. Ex. 5.)  The evidence shows, however, that many Ram Tool salesmen

regularly conducted business using personal cell phones and personal email

addresses accessible from home and public computers.

Robert Maples ("Maples") is a senior recruiter for White Cap.  Over the

course of a number of months, beginning in July 2010, Maples recruited

Pruitt, Maruk, Peach, Mears, and Morrissey to work for White Cap.  Based on

the evidence in the record, the Court has constructed the following timeline

of events surrounding Maples' recruitment of these Ram Tool employees and

White Cap's opening of a new branch in Nashville:

In late July 2010, Maples initiated contact with Pruitt by leaving a

voicemail and explaining his role as a recruiter for White Cap.  Pruitt quickly

returned the call and the men discussed Pruitt's work history and possible

employment with White Cap.  (Maples Dep. 49-51.)  Approximately three

weeks to a month later, Pruitt provided Maples with the contact information

for Maruk, Peach, and Morrissey.  Pruitt told Maples that these individuals

had interest in exploring their career opportunities with White Cap.  (Maples Dep. at 52-53; Pruitt Dep. at 94-95.)  Maples proceeded to contact Maruk, Peach, and Morrissey to discuss their interest.

On October 6, 2010, Pruitt, Maruk, Peach, Morrissey, and Maples had dinner with Paul Radomski ("Radomski"), White Cap's regional vice president; Craig McCurdy ("McCurdy"), a White Cap district manager; and Chris Davis, ("Davis") a White Cap district sales manager.  (Maples Dep. at 55.)

On October 19, 2010, Maruk sent Peach, at Peach's request, a list of his top customers with approximate monthly sales figures.  On October 28, 2010, Maples sent an email to Radomski and John Stegeman ("Stegeman"), White Cap's president, that included the top ten to twelve sales customers and approximate monthly and/or yearly sales figures for Maruk, Pruitt, Morrissey, and Peach.  (Pl. Ex. 107.)  Maples testified that he asked each man for a list of his top ten or twelve customers and how much they sold each month; he received most of that information from the Ram Tool employees over the phone.  (Maples Dep. 35-37, 62-63, 93.)  Maples' email to Radomski and Stegeman also included a description of his understanding of Ram Tool's

commission schedules for salesmen.  (Pl. Ex. 107.)  Maples testified he got this information from Mark Eberhart, a White Cap employee who used to work for Ram Tool.  (Maples Dep. at 97-99.)

On October 26, 2010, Maruk emailed a message to Pruitt, Peach, and Morrissey entitled "Vendor's List October 2010."  (Pl. Ex. 27; Maruk Dep. at 79.)  Maruk's email read: "Only the three musketeers get this update. Everyone else needs to stay in the dark."  (Pl. Ex. 27.)  The document attached to the email lists the names of a number of vendors used by Ram Tool, as well as phone numbers, cost figures, and the types of items they sell.  (*Id.*)  Maruk testified that he created, maintained, and updated the list as part of his job at Ram Tool and provided it to inside and outside salesmen. (Maruk Dep. at 80-84.)  He explained that he regularly emailed salesmen in groups and had nicknames for various groups and individuals.  The "three musketeers" was his nickname for Pruitt, Peach, and Morrissey.  According to Maruk, the "stay in the dark" phrase was intended to be a joke.  (*Id*. at 84.)  There is no direct evidence that this list was sent to Maples or anyone at White Cap.

In or around October 2010, Maruk also compiled a detailed list of every sale that occurred at Ram Tool's Nashville branch in the last half of 2010. (Pl. Ex. 25.)  The document was created on his Ram Tool work computer, but Maruk admitted it was not compiled for his work at Ram Tool.  (Maruk Dep. at 75.)  Maruk testified that he later assembled an inventory "wish list" for Pruitt using this sales list, but he never sent Pruitt, Maples, or anyone at White Cap this particular list.  (*Id*. at 75-78.)  Maruk also kept a detailed listing of the inventory at Ram Tool's Nashville branch on his work computer. He began to change the Ram Tool codes to vendor names, but he did not complete the changes.  (Pl. Ex. 24.)  Maruk testified that he also used this list to create the inventory "wish list" later sent to Pruitt.  The list with partially-changed codes was not provided to anyone at White Cap.  (Maruk Dep. at  67-72.)

On November 17, 2010, Pruitt, Maruk, Peach, and Morrissey again had dinner with Maples and Radomski.  This time, Stegeman joined them. (Maples Dep. at 64.)  According to Maples, the goal of the dinner was to get Stegeman's approval to open a branch in Nashville and Stegeman wanted to meet with the potential new hires.  (*Id*. at 65.)  Maples testified that the

Ram Tool salesmen requested White Cap catalogs, so he brought those to the meeting.  After the dinner, Maples asked Pruitt to create a "wish list" of inventory for the new branch, as well as "anything else you might have in mind as it pertains to vehicles or future staffing."  (*Id.* at 66-67.)

On December 1, 2010, Maruk sent Pruitt an email that read: "I worked on this until 10 pm, up again at 2.  Still not as nice as I would like it, bit it shows approx avg monthly inventory trequirements for about 1400 items. Hope Bob and Company can work with this." [sic] (Pl. Ex. 8.)  Attached to the email was a 44-page list called "COMBINED INVENTORY."  (*Id.*)  The document lists the items stocked by Ram Tool for its Nashville branch.  Maruk testified that he took that information directly from Ram Tool computers.  (Maruk Dep. at 29-30.)  The document also includes approximate monthly inventory numbers for each item.  Maruk testified that he looked at the numbers in Ram Tool's system and "generally rounded numbers from what I thought was, you know, a reasonable monthly inventory."  (*Id.* at 30.)  Pruitt forwarded the document to Maples later that day, per Maples' request for a "wish list." Pruitt  also  emailed  Maples  documents  detailing  what  he  thought  was necessary for a truck fleet in Nashville and his estimates for the salaries of

various other employees in the Ram Tool Nashville branch, as well as the amounts he believed they might accept to work for White Cap.  (Pl. Ex. 31.)

Maples forwarded the inventory "wish list," vehicle list, and staff list to Radomski, saying: "I had the guys work on this over the holiday break.  No worries.  This was not done on their company time, computers, nor letter head.  This was sent to me from Pruitt's personal email.  This is their wish list as it pertains to inventory, vehicles and future staffing."  (Pl. Ex. 10.) Maples forwarded the inventory list to McCurdy and Davis with the message: "Keep this close to the vest." (Pl. Ex. 53.)  McCurdy testified that he looked at the inventory list, but White Cap used its own process to determine the manner in which the Nashville branch would be stocked.   That process included consideration of a distribution center in Atlanta (Ram Tool does not utilize distribution centers) and the fact that the Nashville branch would include a large show room.   White Cap ran numbers on stock carried in Atlanta-area branches and nationwide to determine what items to put in its Nashville branch.  It instituted a different operating system than Ram Tool, and planned to freeze inventory numbers in Nashville for six months before adjusting according to min/max levels.  White Cap's process for determining

its Nashville inventory did not utilize any of the information provided by Maruk and Pruitt to Maples.

On December 2, 2010, Pruitt sent Maples the resume of Mears and noted: "he is the other inside salesman that we are bringing with us."  (Pl. Ex. 15.)  On December 8, 2010, Maples sent an internal email to Stegeman, Radomski, and others outlining the job offers and salary ranges proposed for Pruitt, Maruk, Peach, and Morrissey.  Offers were made to those individuals days later.

On December 30, 2010, Pruitt, Maruk, Mears, Peach, and Morrissey resigned their employment with Ram Tool.  On December 31, 2010, Radomski sent an internal email at White Cap that said, "We dropped the bomb on Ram Tool in Nashville yesterday afternoon."  (Pl. Ex. 67.)

On January 2, 2011, Pruitt received information from Ram Tool employee Tim McMaster regarding McMaster's top twelve customers and approximate yearly sales information.  Pruitt forwarded that information to Maples.  (Pl. Ex. 112.)  McMaster resigned his employment with Ram Tool to work for White Cap on January 16, 2011.

III.   Personal Jurisdiction and Venue.

Defendants seek dismissal of Plaintiff's claims against individual defendants Robert Maples, Tim Pruitt, and Leonard Maruk (collectively, "the Individual Defendants") for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2).[4]   (Doc. 3 at 1.)   In the alternative, Defendants request, in the interests of justice, that the Court transfer this case to the United States District Court for the Middle District of Tennessee. (*Id.*)

It is a question of law whether a federal court has personal jurisdiction over a defendant.  *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).  The plaintiff "bears the ultimate burden of establishing that personal jurisdiction is present." *Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009).  To establish a prima facie case of personal jurisdiction over a non-resident, a plaintiff must present "enough evidence to withstand a motion for a directed verdict." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d at 1291.  To the extent they are uncontroverted by

---

[4]Defendants' motion seeks dismissal of Plaintiff's claims against all defendants, including White Cap.  However, White Cap subsequently notified the Court that it was withdrawing its motion to dismiss or transfer venue.  (Doc. 17.)

the defendants' evidence, the Court must accept the allegations in the complaint as true, and all reasonable inferences must be drawn in favor of the plaintiff. *Id.*

The Court's determination of whether it has personal jurisdiction over a non-resident defendant turns on a two-prong test. *See, e.g., Madara v. Hall*, 916 F.2d 1510, 1515-16 (11th Cir. 1990). Only if both prongs are satisfied will the Court assert jurisdiction. *Abramson v. Walt Disney Co.*, 132 Fed. Appx. 273, 275 (11th Cir. 2005) (citing *Madara*, 916 F.2d at 514). "The first prong of that analysis requires examination of whether a basis of jurisdiction is provided under the forum state's long arm statute." *Id.* "If that prong is met, the second prong requires consideration of whether there are sufficient minimum contacts to satisfy due process concerns." *Id.*

Alabama's long-arm statute permits the exercise of jurisdiction over non-residents to the "fullest extent allowed under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1355-56 (11th Cir. 2000). Because the due process guarantees of the Alabama Constitution are coextensive with that of the Constitution of the United States, this Court turns to the question

whether the requirements for personal jurisdiction under the Due Process Clause of the Fourteenth Amendment have been satisfied.  *See Ex parte Georgia Farm Bureau Mut. Auto. Ins. Co.*, 889 So. 2d 545, 550 (Ala. 2004).

"Considerations of due process require that a non-resident defendant have certain minimum contacts with the forum, so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice."  *Consol. Dev. Corp.*, 216 F.3d at 1291; *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The sufficiency of the defendant's contacts with the forum state depends on the quantity and quality of those contacts, as well as the type of personal jurisdiction being asserted: specific or general.  *Id*.  "Initially, it is the plaintiff's burden to establish such minimum contacts, however, once established, the burden then shifts to [the] defendant to demonstrate that the exercise of jurisdiction would offend traditional notions of fair play and substantial justice."  *Peacock v. Merrill*, 2005 WL 2233466 at *2 (S.D. Ala. 2005) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985); *Ruiz de Molina*, 207 F.3d at 1358).

The nature and quality of the required minimum contacts "vary depending upon whether the type of personal jurisdiction being asserted is

specific or general." *Consol. Dev. Corp.*, 216 F.3d at 1291.  In this case, Ram

Tool contends that this Court has specific jurisdiction over the Individual

Defendants.  "Specific jurisdiction arises out of a party's activities in the

forum that are *related to the cause of action alleged in the complaint*.  *Id.*

(citations omitted) (emphasis added).  Such "minimum contacts" are

sufficient only where it is shown the defendant "purposefully avail[ed] itself

of the privilege of conducting activities within the forum State, thus invoking

the benefits and protections of its laws."  *Id.* (quoting *Hanson v. Denckla*, 357

U.S. 235, 253 (1958)).  The "minimum contacts" requirement is grounded in

fairness and "assures that 'the defendant's conduct and connection with the

forum State [is] such that he should reasonably anticipate being haled into

court there.'"  *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444

U.S. 286, 297 (1980)).  Furthermore, the "'purposeful availment' requirement

ensures that a defendant will not be haled into a jurisdiction solely as a

result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the unilateral

activity of another party or a third person."  *Burger King Corp. v. Rudzewicz*,

471 U.S. 462, 475 (1985) (internal citations omitted).  "So long as it creates

a 'substantial connection' with the forum, even a single act can support jurisdiction." *Id*. at 475 n.18 (citation omitted).

The Amended Complaint includes sweeping allegations regarding the Individual Defendants' contacts with Alabama.  In the Amended Complaint, Plaintiff concludes that "Maples regularly conducts business in Alabama" (Doc. 25 ¶ 3), and "[Pruitt and Maruk] have substantial contacts in Alabama including, but not limited to, the sale of tools and supplies in Alabama. . . . [They also] were trained by Ram Tool in Alabama" (*Id*. ¶ 4).

The Individual Defendants, however, each submitted affidavits opposing Plaintiff's contention that their contacts in Alabama are substantial.  The Individual Defendants all testify that they neither work nor live in Alabama, nor do they have any offices, agents, or property in Alabama.  Maples swears that he has never solicited or transacted any business in Alabama.  (Maples Aff.[5] ¶ 6.)  Pruitt maintains that his Ram Tool customers were in Tennessee and Kentucky, and he does not recall having customer accounts in Alabama. (Pruitt Aff. ¶ 7.)  Pruitt allows that he visited Alabama a few times to meet

---

[5]Maples has submitted two affidavits in this action.  The affidavit referenced as "Maples Aff." is attached to Defendants' motion to dismiss or transfer venue.  (Doc. 3.) "Maples Aff. II" is attached to Maple's reply submission.  (Doc. 27.)

with individuals in the Ram Tool home office and to help train a fellow

salesman in Huntsville, Alabama.  However, he contends that none of these

visits involved alleged confidential information that is the subject of this

lawsuit.  (*Id*.)  Maruk testified that he lived in Mobile, Alabama, for the first

three months of his employment with Ram Tool in 2006, but he moved to

Nashville, Tennessee, in or around October 2006, when he took the

operations manager position.  (Maruk Aff. ¶ 4.)  In the four years that he

worked for Ram Tool in Tennessee, he recalls visiting Alabama three

times—once for an operations managers' meeting and for computer training.

(*Id*. ¶ 6.)  All three defendants testified that all of their communications with

White Cap occurred in Tennessee.  White Cap has no offices, property, or

employees in Alabama.

In support of jurisdiction, Plaintiff proffers the following evidence of

the Individual Defendants' connections with the State of Alabama (Doc. 19

at 3-5):

- Pruitt and Maruk were employees of Ram Tool, an Alabama corporation that is headquartered in Birmingham, Alabama.

- As part of his employment with Ram Tool, Pruitt helped Wayne Penchosky, a Ram Tool salesman in Huntsville, Alabama, develop

business with masonry clients in North Alabama. (Penchosky Aff.¶¶ 3-4.) Pruitt's assistance included making joint sales calls with Penchosky to Alabama customers, developing pricing structures, and being involved with billing and delivery issues. As recently as November or December 2010, Pruitt visited a client in Alabama to assist Penchosky. (*Id.* ¶ 5.)

- In the "past two years," Pruitt was "involved in" nine (9) sales orders for job sites or customers in Alabama, which amounted to $15,000 in sales. (Naftel Aff. ¶ 5.) Pruitt also conducted sales training for other Ram Tool employees in Alabama "on multiple occasions" at unknown times. (*Id.*)

- In the "past two years," Maruk was "involved in" 150 sales orders for job sites or customers in Alabama, which amounted to $225,000 in sales. (*Id.* ¶ 7.) Maruk also received "training," in Birmingham, Alabama, but Plaintiff's evidence does not specify what kind of training or when it occurred. (*Id.*)

- Maples made recruiting telephone calls to two Ram Tool employees in Alabama in September 2010. (Scott Murchison Aff. ¶ 3; Pat Murchison Aff. ¶ 3.) He made one or two other recruiting telephone calls to Ram Tool employees in Alabama, but there is no evidence when these calls occurred.[6] (Maples Dep. at 27, 54; Maples Aff. II ¶ 2.)

Plaintiff's evidence establishes that each of the Individual Defendants has contacts with the State of Alabama. However, the evidence does not establish that the Individual Defendants' Alabama contacts are "related to the plaintiff's cause of action." *Consol. Dev. Corp.*, 216 F.3d at 1291; *Posner*

---

[6]These latter telephone calls are not mentioned by Plaintiff in its opposition brief.

*v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1220 (11th Cir. 1999).  "[I]t is not enough that there be some *similarity* between the activities that connect the defendant[s] to the forum and the plaintiff's claim.  Rather, the plaintiff's claim must 'arise out of' the defendant[s'] contacts with the forum." *Licciardello v. Lovelady*, 544 F.3d 1280, 1284 n.3 (11th Cir. 2008) (citing *Burger King*, 471 U.S. at 474 n.15) (emphasis in original).

Plaintiff's claims arise out of the alleged misappropriation of confidential and proprietary information in and around October through December 2010, when Pruitt and Maruk engaged in communications with Maples and other White Cap employees/representatives regarding future employment and a future White Cap branch in Nashville, Tennessee.  There is no argument or evidence that Pruitt and Maruk's "involvement" in sales orders for job sites or customers in Alabama was the subject of any of the purported misappropriation of confidential information, nor that the unspecified "involvement" led to the acquisition of said confidential information.  There is no argument or evidence that Plaintiff's claims arise out of Pruitt conducting sales training in Alabama or assisting Penchosky in developing business with masonry clients.  There is also no evidence or

argument that the training provided to Pruitt and Maruk in Alabama was in any way related to issues of confidentiality or the subject matter of this litigation.  The two recruiting telephone calls that Maples made in September 2010, were made prior to the dates any alleged confidential or proprietary information was sent to White Cap, and there is no evidence nor allegation that Maples made the identified recruiting calls to Alabama employees using confidential information.

Plaintiff argues that it is enough that Ram Tools is headquartered in Birmingham, Alabama, and the Individual Defendants knew the "effects" of their purported misconduct would be felt in Alabama.  (Doc 19 at 7.)  "Yet, 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp.*, 444 U.S. at 295.  Plaintiff cites *Calder v. Jones*, 465 U.S. 783 (1984), as support for it's "effects" argument.  In *Calder*, the U.S. Supreme Court held that a California court had personal jurisdiction over Florida residents accused of writing and publishing a purportedly libelous article about a California resident in the National Enquirer.  The Supreme Court found that the allegedly libelous story, the very subject of the plaintiff's claims:

> concerned the California activities of a California
> resident.  It impugned the professionalism of an
> entertainer whose television career was centered in
> California.  The article was drawn from California
> sources, and the brunt of the harm, in terms both of
> respondent's emotional distress and the injury to her
> professional reputation, was suffered in California.
> In sum, California is the focal point of the story and
> of the harm suffered.  Jurisdiction over petitioners is
> therefore proper in California based on the "effects"
> of their Florida conduct in California.

465 U.S. at 788-89.  Unlike *Calder*, the focal point of Plaintiff's claims in this case is Tennessee, and the brunt of the harm alleged (i.e., loss of employees, loss of customers, loss of profits, loss of confidential or proprietary information) is in Tennessee.   The "effects" of the Individual's purported misconduct is felt by Plaintiff in Alabama only to the extent it is felt first in Tennessee.

Plaintiff has failed to establish, through evidence sufficient to withstand a motion for a directed verdict, that the Individual Defendants' contacts with Alabama were (1) related to Plaintiff's cause of action or gave rise to it; (2) involved some act by which the Individual Defendants purposefully availed themselves of the privilege of conducting activities in Alabama; and (3) were such that the Individual Defendants should reasonably

anticipate being haled into court in Alabama. Accordingly, Defendants' motion to dismiss is due to be granted. Maples, Pruitt, and Maruk will be dismissed from this action, without prejudice, for lack of personal jurisdiction.

IV.    Preliminary Injunction.

Plaintiff seeks a preliminary injunction preventing White Cap, and all of White Cap's employees, from soliciting Ram Tool employees; conducting any business in the Nashville, Tennessee, market; and using confidential information obtained from Ram Tool to compete with Ram Tool in any market. (Doc. 30 at 1.)

A preliminary injunction is an "extraordinary and drastic remedy." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Before a district court may issue a preliminary injunction, the burden is on the moving party to demonstrate (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Id*. A preliminary injunction

may not be granted "unless the movant clearly establishe[s] the 'burden of persuasion' as to each of the four prerequisites." *Id.* (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). "Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits." *American Civil Liberties Union of Fla., Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1198 (11th Cir. 2009). Moreover, "[a] showing of irreparable injury is 'the *sine qua non* of injunctive relief.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990), *rev'd on standing grounds*, 508 U.S. 656 (1993)). "[T]he asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Id.* (quoting *City of Jacksonville*, 896 F.2d at 1285).

A.     Substantial Likelihood of Success on the Merits.

In both written memoranda and oral argument, Plaintiff bases its entitlement to preliminary injunctive relief primarily on its ATSA claim. The evidentiary hearing and supplemental filings focused entirely on whether alleged misappropriated material was a "trade secret" under ATSA. The

Amended Complaint, however, also includes claims against White Cap for

intentional interference with business relations, conversion, trespass, and

civil conspiracy.[7]  (Doc. 25.)  In appropriate circumstances, these tort claims

_____

[7]Defendants cite *Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*, 690 F. Supp. 2d 1267, 1276-77 (M.D. Ala. 2010), for the proposition that Plaintiff's state law tort claims are preempted by ATSA.  (Doc 32, attach. 1 at 16.)  In this non-binding opinion, the U.S. District Court for the Middle District of Alabama quotes the Alabama Supreme Court's acknowledgment that ATSA "replace[s] common law tort remedies for the misappropriation of trade secrets, while leaving existing contract remedies or safeguards in place." *Id*. (quoting *Allied Supply Co., Inc. v. Brown*, 585 So. 2d 33, 37 (Ala. 1991)).  The Middle District then dismisses the plaintiff's breach-of-fiduciary duty claim because the factual basis for the claim is "essentially the same as the one for the ATSA claim." *Id*. at 1276.

Indeed, in *Allied Supply Co., Inc.*, the Alabama Supreme Court determined that a plaintiff cannot "pursue both statutory and common law theories of recovery for the defendants' alleged misappropriation of 'trade secrets' or confidential documents.'" 585 So. 2d at 37.  At first glance, this decision appears to pre-empt the use of all common law tort remedies if the plaintiff contends that confidential documents and/or trade secrets have been misappropriated.  A closer look at state law, however, reveals this is not the case.

First, if alternative tort remedies were, in fact, prohibited when the misappropriation of trade secrets is alleged, this Court would expect the purported mandate in *Allied Supply Co.*, to have been cited several times for that proposition since its issuance in 1991.  This Court cannot locate any Alabama court opinion, prior to the Middle District's decision in 2010, which cited *Allied Supply Co.*, in this manner.

More importantly, when we look to the statute itself, Ala. Code § 8-27-6, simply states that ATSA supersedes "the common law of trade secrets," when the statute is inconsistent with the common law.  Both the statute and the legislative comments to section 8-27-6—the latter of which is cited by *Allied Supply Co.*, immediately after the language in question here—are clear that ATSA supersedes only the common law action for misappropriation of trade secrets.  The common law action for "misappropriation of trade secrets" had developed in the courts and was outlined in the first Restatement of Torts (1939), prior to the institution of ATSA.  ATSA does not pre-empt alternative tort law claims, such as conversion or breach of fiduciary duty, which may also involve allegations involving the misappropriation of trade secrets.

can be grounds for injunctive relief.  However, Plaintiff has the burden of persuasion to establish substantial likelihood of success for each of these claims.

Plaintiff grounds all of its claims in Alabama law.  A choice of law issue has not been raised by the defendants; therefore, the Court will defer to the parties and analyze Plaintiff's claims, for the purposes of the motion for preliminary injunction, using Alabama law.

       1.    ATSA.

Under ATSA, "[a] person who discloses or uses the trade secret of another, without a privilege to do so, is liable to the other for misappropriation of the trade secret if:

> (1) That person discovered the trade secret by improper means;
>
> (2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;
>
> (3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2), above; or

(4) That person learned the information and knew or should have known that it was a trade secret and that its disclosure was made to that person by mistake.

Ala. Code § 8-27-3.  A "trade secret" is information that:

a. Is used or intended for use in a trade or business;

b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;

c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;

d. Cannot be readily ascertained or derived from publicly available information;

e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

f. Has significant economic value.

*Id*. § 8-27-2(1).  "Improper means" include:

a. Theft;

b. Bribery;

c. Misrepresentation;

d. Inducement of a breach of confidence;

e. Trespass; or

> f. Other deliberate acts taken for the specific purpose of gaining access to the information of another by means such as electronic, photographic, telescopic or other aids to enhance normal human perception, where the trade secret owner reasonably should be able to expect privacy.

*Id*. § 8-27-2(1).

In its initial memorandum in support of a preliminary injunction, Plaintiff's entire discussion regarding its likelihood of success on the merits of its ATSA claim, after citation of the statute, is six sentences. (Doc. 31 at 8-9.) In sweeping terms, Plaintiff maintains that much of its business information qualifies as a "trade secret" (but does not identify what, specifically, it can show was disclosed or used or cite to evidence); it took reasonable steps to ensure the confidentiality of the unidentified material (but does not describe those steps or cite to evidence); the defendants used that information to plan a competing business (but does not explain how it was used or cite to evidence); and Ram Tool has a "substantial likelihood of success on the merits o[f] this claim." (*Id*.)

At the evidentiary hearing, Plaintiff argued: "We have a universe of things they admitted they took.  We have a universe of things we think they

took.  We believe today that we will be able to establish that these were trade secrets of Ram Tools."  Then Plaintiff presented witness testimony regarding an inventory list, lists of several salesmen's "top" customers with a monthly sales figure (and sometimes an annual sales figure); a list of vehicles; a partial list of staff at the Ram Tool Nashville branch with estimated salary figures; a commission structure for sales staff; a multiperiod report; Dodge reports; and a year-to-date summary by Nashville branch salesmen.  In a supplemental filing, Plaintiff focuses on two of these items: the "top" customer lists and the inventory list.   (Doc. 35.) "[T]he onus is upon the parties to formulate arguments." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  The plaintiff has the burden of persuasion in this case.  It is not the Court's burden to dig through the evidence and "distill every potential argument that could be made based upon the materials before it." *Id.*; *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"); *Federal Ins. Co. v. County of Westchester*, 921 F. Supp. 1136, 1139 (S.D.N.Y.1996) ("Under the adversary system, it is counsel's

responsibility to explain why these points have legal merit; the Court does not serve as counsel's law clerk.").  Since Plaintiff has submitted specific arguments with regard to only two types of alleged trade secrets, the Court will evaluate Plaintiff's ATSA claim only with regard to these two items.

        a.     "Top" Customer Lists.

There is no doubt that Maples, a White Cap employee, asked for, and obtained, the names and monthly/annual sales figures of the top "10 or 12" customers for Pruitt, Maruk, and several other Ram Tool employees.  (Maples Dep. at 35-37; Pl. Ex. 107.)   This information was sent to White Cap's President, John Stegeman, and Regional Vice President, Paul Radomski, as a part of White Cap's hiring process.

"[C]ustomer lists may, in proper circumstances, be afforded the protection of a trade secret."  *Public Sys., Inc. v. Towry*, 587 So. 2d 969, 973 (Ala. 1991) (citing *Birmingham Television Corp. v. DeRamus*, 502 So. 2d 761 (Ala. Civ. App. 1986).  Generally, the lists that are provided protection as trade secrets are those that contain "specific information about customers, for example, their buying habits."  *Id*. (citing *Zoecon Indus. v. American Stockman Tag Co.*, 713 F.2d 1174 (5th Cir.1983). While the "customer lists"

in this case are not an extensive compilation of numerous customers, what they buy, and when they buy, they have more detail than lists that have not been given trade secret protection—lists of "readily ascertainable potential clients." *Id.* (citing *Affiliated Paper Cos. v. Hughes*, 667 F. Supp. 1436 (N.D. Ala.1987)). Plaintiff has presented sufficient evidence that the customer names and sales numbers on these lists were considered confidential and could not be readily ascertained from publicly available information. The lists in question are clearly compilations of information used in a business, and they have economic value as a means to assess the sales strength of a potential hire, as well as a means to identify customers with purchasing power in the Nashville area.

The Court is not convinced, however, that Plaintiff has adduced sufficient evidence that it is substantially likely to prevail on the issue of whether the information contained in these "top" customer lists was the subject of reasonable efforts to keep it secret. Plaintiff has shown that their employees received an employee handbook when they commenced working for Ram Tool; the handbook includes a confidentiality policy statement. (Pl. Ex. 2.) The confidentiality policy states that "customer information" is

confidential, and describes "customer information" as "compilations of past,

existing or prospective customers, customer proposals or agreements

between customers and Company, customer pricing, status of customer

accounts or credit, or related information about actual or prospective

customers." (*Id*.)  And, every time Ram Tool employees logged into their

work computers, they read the following statement:

> All information on this computer and network is
> property of Ram Tool and Supply Co, Inc and is
> protected by state and federal law.  All users must be
> assigned an account to access information and are
> only allowed to access information as permitted by
> the System Administrator and your supervisor.  All
> user activities may be monitored and logged.
> Information residing on Ram Tool computers is not to
> be disclosed to outside parties without prior written
> consent of Ram Tool's Executive Management.  By
> proceeding you acknowledge your agreement with
> these terms.

(Pl. Ex. 5.) If the evidence showed that this log-in statement appeared every

time a Ram Tool employee accessed customer information that was intended

to be kept confidential, the Court could conclude that Plaintiff had met its

burden and was substantially likely to prevail on this ATSA claim.  However,

the evidence also shows that Ram Tool salesmen used personal phones and

conducted business using personal email addresses accessible from their home or any public computer.  Sales information, including customer names and sales data was emailed to salesmen at their request.  (*see, e.g.*, Maruk Dep. at 59-60, 67.)  This information, which was not stamped or marked "confidential," could then be saved and accessed from personal devices outside Ram Tool's sphere of control.  When the evidence seems to suggest a casual atmosphere and lackadaisical handling of information that Plaintiff insists is incredibly confidential and detrimental to its business if placed in a competitor's hands, the Court cannot say that Plaintiff is substantially likely to prevail on this issue.

        b.    Inventory List.

Turning to the inventory list in question, the Court finds that Plaintiff has proffered sufficient evidence to establish that information therein is a trade secret under ATSA.  The inventory list contained the names of approximately 1,400 items stocked by Ram Tool at its Nashville branch and an estimated average monthly sales figure for each item.  (Pl. Ex. 8.) Plaintiff has shown that this inventory information, especially the estimated average monthly sales, is a compilation of business information not publicly

known or readily ascertainable, and it has significant economic value for an individual or company wishing to identify which items will sell in the Nashville market.  Unlike customer sales information, the Court has not heard any evidence that the inventory information contained in this list was circulated to salesmen at private email addresses or otherwise accessible from personal electronic devices, and it appears that reasonable efforts were made to maintain the data's secrecy.

There is insufficient evidence, however, to establish that White Cap actually *used* the information in this inventory list.[8]  The Court is convinced that the data is valuable and helpful to a business establishing a new branch in a new market.  There is evidence that Craig McCurdy, district manager for White Cap and a project manager with partial responsibility for determining what inventory would stock the new Nashville branch, reviewed the inventory

---

[8]ATSA prohibits the use *or* disclosure of trade secrets.  Ala. Code § 8-27-3; *IMED Corp. v. Systems Eng'g Assocs. Corp.*, 602 So. 2d 344, 346 (Ala. 1992).  It appears to the Court, however, that Plaintiff only makes an ATSA claim for "use" of trade secrets. Under Count I of the Amended Complaint, Plaintiff specifies that ATSA "prohibits any person from *utilizing* the trade secrets of another for that person's commercial advantage." (Doc. 25 ¶ 39 (emphasis added).)  No mention is made of disclosure.  Again, in Plaintiff's brief in support of the preliminary injunction, Plaintiff argues that their former employees "worked with White Cap to *use* this information in order to plan a competing business." (Doc. 31 at 8 (emphasis added).)

list in question.   However, White Cap presented a wealth of evidence at the evidentiary hearing showing that White Cap used its own method for determining what inventory would fill the Nashville branch, and there is no evidence that any information in the disputed inventory list was utilized. Without evidence that White Cap used the trade secret information it obtained, Ram Tool has not established a substantial likelihood of success on the merits of this ATSA claim.

        2.     Intentional Interference with Business Relations.

In order to prevail on a claim for intentional interference with business relations, a plaintiff must prove:

> 1. The existence of a contract or a business relation;
>
> 2. The defendant's knowledge of the contract or business relation;
>
> 3. Intentional interference by the defendant with the contract or business relation;
>
> 4. The absence of justification for the defendant's interference; and
>
> 5. Damage to the plaintiff as a result of the defendant's interference.

*Walls v. State Farm Mut. Auto Ins. Co.*, 984 So. 2d 412, 414 (Ala. 2007) (citing

*Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1152

(Ala. 2003)).   After citation to the statute and non-binding case law

addressing situations in which former employees signed non-compete

agreements, Plaintiff makes a two-sentence argument: "The defendants in

this case . . . utilized Ram Tool's detailed customer sales records, pricing

information and inventory to interfere with Ram Tool's business relations

with its existing customers."  This conduct is a tort under Alabama law and

[P]laintiff is likely to prevail on the merits."  (Doc. 31 at 11.)

Plaintiff does not identify the customer contracts or relationships it

contends were interfered with.  Plaintiff does not argue or establish White

Cap's knowledge regarding the unidentified customer contracts or

relationships, or absence of justification for the purported interference.

There has also been no showing of damages.  As outlined above, the Court is

not responsible for amassing the evidence and legal argument to support

Plaintiff's claims.  Establishing entitlement to a preliminary injunction is a

heavy burden, and Plaintiff cannot meet that burden by filing hundreds of

pages of evidence with the Court and making sweeping legal conclusions.

Plaintiff has not demonstrated that it is substantially likely to succeed on the merits of its intentional interference with business relations claim.

        3.    Conversion.

Plaintiff has also included a claim for conversion of its confidential and proprietary information.  Its legal argument in support of its likelihood to succeed on the merits is scant: three sentences.  (Doc. 31 at 11-12.)

"To constitute conversion, there must be a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse of another's property. . . . Conversion requires 'a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has . . . the immediate right to possession.'" *Dunn v. Williams*, 28 So. 3d 807, 813 (Ala. Civ. App. 2009) (quoting *Covington v. Exxon Co., U.S.A.*, 551 So. 2d 935, 938 (Ala. 1989)). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner."  *Id*. at 814 (quoting 90 C.J.S. *Trover and Conversion*, § 3 (2002)).  As discussed above in the context of Plaintiff's ATSA claim, Plaintiff has established that customer and inventory information was taken and given to White Cap through Maples.

The evidence does not show, however, that Plaintiff was completely deprived of its property rights to this information.  Rather, the data was copied prior to its acquisition.  *See, e.g., Clay County Abstract Co. v. McCay*, 147 So. 407, 409 (Ala. 1933) ("The copying of the books was not a conversion of the books themselves, but, at most, an invasion of the plaintiff's common-law copyrights . . . .")  Plaintiff has not proffered sufficient evidence to prove a substantial likelihood of success on the merits of a conversion claim.

        4.     Trespass.

      Overlapping Plaintiff's conversion claim, Ram Tool also contends that White Cap is liable for trespass *de bonis asportatis*, or "trespass to goods or trespass to personalty."  *Ganey v. Henley*, 71 So. 2d 281, 282 (Ala. 1954).  Like a conversion claim, the gist of a trespass to goods claim is "disturbance of the possession" of another.  *Barnett v. Bolling*, 73 So. 2d 575, 576 (Ala. App. 1954) (citing *Pollard v. Pollard*, 92 So. 488 (Ala. 1922)).  Because the alleged misappropriated information in this case was copied, there is no evidence that Plaintiff's possession of its property was ever disturbed.  Plaintiff has not established a substantial likelihood of success on this claim.

5.    Civil Conspiracy.

Finally, Plaintiff contends that White Cap is liable for civil conspiracy. Plaintiff does not specify the basis for its civil conspiracy claim.  It does not detail the role of White Cap, or any other person, in said conspiracy or cite in its argument to evidence establishing the agreement of purported co-conspirators to do something unlawful.  (Doc. 31 at 12-13.)  *See, e.g.*, *Purcell Co., Inc. v. Spriggs Enters., Inc.*, 431 So. 2d 515, 522 (Ala. 1983).  Again, it is not the Court's responsibility to  piece together evidence to support the allegations in Plaintiff's pleadings.

Moreover, Ram Tool concedes that in order to have a conspiracy claim, it "must have a valid underlying cause of action."  (Doc. 31 at 13) *See, e.g.*, *Goolesby v. Koch Farms, LLC*, 955 So. 2d 422,430 (Ala. 2006) ("A civil conspiracy cannot exist in the absence of an underlying tort.") (citing *Avis Rent a Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1124 (Ala. 2003)). As outlined above, Plaintiff has not established a substantial likelihood of success on the merits of any of its underlying tort claims.   Accordingly, Plaintiff has not demonstrated it has a substantial likelihood of success on its claim for civil conspiracy.

B.    Irreparable Injury.

Even if the Court assumes that Plaintiff has shown a substantial likelihood of success on their claim(s) against White Cap, Ram Tool has not demonstrated that irreparable injury will be suffered unless an injunction issues. *See Snook v. Trust Co. of Georgia Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of preliminary injunction even though plaintiff established likelihood of success because plaintiff failed to meet the burden of proving irreparable injury).  As outlined above, in order to qualify as irreparable harm, "the injury must be neither remote nor speculative, but actual and imminent."  *City of Jacksonville*, 896 F.2d at 1285.   "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay" do not reach the actual and imminent standard.  *Sampson v. Murray,* 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Plaintiff argues:

> The evidence in this case demonstrates that White Cap planned and developed its Nashville branch by utilizing inside information on Ram Tool's inventory, pricing, sales history, employees, and vendors. This confidential business information was taken by Defendants Maruk and Pruitt while they were still employed by Ram Tool and was admittedly provided to White Cap. White Cap used this information to develop its pro forma for Nashville and to recruit away Ram Tool employees.

(Doc. 31 at 14.) The Court disagrees.

At the evidentiary hearing on March 9, 2011, White Cap presented a dearth of evidence showing the steps it took to set up its Nashville branch and determine what inventory would be offered and stocked. Plaintiff was able to establish that a list of Ram Tool's inventory and average monthly sales was received and reviewed by the project manager charged with organizing the Nashville branch. However, Ram Tool was not able to point to any evidence that the inventory information was actually used by White Cap. White Cap carries an inventory of different items in different amounts and uses a distribution center model that changes the manner in which it manages its inventory. Moreover, the evidence shows that the inventory list

has been returned to the plaintiff and deleted from the White Cap system, preventing its future use.

Plaintiff does not specifically identify the irreparable harm suffered by White Cap's recruitment of Ram Tool employees.  The evidence shows that White Cap used "top" customer lists, which contained information intended to be confidential, in its consideration of whether to hire Ram Tool employees Pruitt, Maruk, Mears, Morrissey, and Peach.  (Pl. Ex. 107.)  The evidence demonstrates, however, that this information was provided by the employees themselves after they first had contact with White Cap and expressed an interest in changing employment.  Plaintiff has not presented any evidence that White Cap used confidential information to initiate recruitment of Ram Tool's employees, or that this confidential information can be used to further recruit current Ram Tool employees.

Plaintiff wants the Court to infer that it lost sales and profits when its previous employees left to work for White Cap.  Plaintiff cites *Mohr v. Bank of N.Y. Mellon Corp.*, 393 Fed. Appx. 639, 646 (11th Cir. 2010), for the proposition that when employees leave to work for a competitor, "the loss of customers and goodwill is an irreparable injury."  (Doc. 31 at 13.)

However, in *Mohr*, and other Eleventh Circuit case law accepting evidence of loss of customers as irreparable injury, the employees at issue were subject to enforceable noncompetition and/or nonsolicitation covenants. *See, e.g.*, *Id.*; *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441 (11th Cir. 1991).  Ram Tool employees did not sign a noncompetition or nonsolicitation agreement.  Ram Tool employees are free to leave and work for a competitor at any time, and there is nothing preventing them from using the knowledge and relationships they obtained at Ram Tool to solicit Ram Tool customers. Plaintiff has not presented evidence that Pruitt, Maruk, or other former Ram Tool employees have used confidential information outside the scope of their memories and established relationships to solicit Ram Tool customers. Plaintiff could have prevented this kind of irreparable injury by having their employees sign noncompetition or nonsolicitation agreements; it did not. Plaintiff cannot use the Court now to achieve a result it failed to bargain for previously.

Because Ram Tool has failed to meet its burden to establish a substantial likelihood of success on the merits or that irreparable injury will be suffered unless the injunction issues, it is not necessary for the Court to

address the remaining requirements for a preliminary injunction.  Plaintiff's

motion for a preliminary injunction will be denied.

V.     Conclusion.

For the reasons outlined above, Defendants' motion to dismiss Robert

Maples, Tim Pruitt, and Leonard Maruk for lack of jurisdiction will be

granted.  Plaintiff's motion for a preliminary injunction will be denied.

Separate orders in conformity with this opinion will be entered.

Done this 21st day of March 2011.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
139297